UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. 07-50025 |
| | ) | |
| Plaintiff, | ) | |
| | ) | REPORT AND |
| vs. | ) | RECOMMENDATION ON |
| | ) | MOTIONS TO SUPPRESS BY |
| MICHAEL WALDRON and | ) | MICHAEL WALDRON AND |
| RYAN LUNBERRY, | ) | RYAN LUNBERRY |
| | ) | |
| Defendants. | ) | |

**INTRODUCTION**

This criminal proceeding is before the court pursuant to an indictment charging Michael

Waldron and Ryan Lunberry[1]  with being unlawful users of a controlled substance in possession

of a firearm, a violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).[2]  Mr. Lunberry has moved to

suppress statements and other evidence that derived from his arrest.  Mr. Waldron has joined in

his co-defendant's motion without asserting any new authority, argument, or facts.

Mr. Lunberry's Motion to Suppress was referred to this magistrate judge for a report and

_____

[1]The indictment lists Ryan Lunberry's name to be "Lu*m*berry."  However, the parties have stipulated that the appropriate spelling of this defendant's name is "Lu*n*berry."  The court entered an oral order correcting the caption accordingly.

[2]The indictment also charges a third co-defendant, Richard Fisher, who has yet to make an appearance on this matter.  Since he has not yet appeared, Mr. Fischer has not filed any motions to suppress or joined in any motions of his co-defendants.

recommendation to the district court pursuant to Judge Schreier's standing order dated June 11, 2007, and 28 U.S.C. § 636(b)(1)(B).

## FACTS

A hearing was set for this matter on July 6, 2007.  However, on that date, no witnesses appeared.  Both the government and Mr. Lunberry had issued subpoenas for Jim Daggett, previously the Sheriff of Shannon County, and two officers from the Oglala Sioux Tribe Department of Public Safety, Officer H. Loud Hawk and Officer Dadrea Rabeler.  However, as of July 6, neither the government nor Mr. Lunberry had successfully served their subpoenas.  The hearing was continued until July 9, 2007, but with the same result–no witnesses appeared.

In lieu of live testimony from witnesses, the government offered transcripts of prior sworn testimony given by these same three witnesses.  A suppression hearing was held on April 3, 2006, and May 8, 2006, in South Dakota Circuit Court for the Seventh Judicial Circuit. Present were Michael Waldron and his attorney, Ryan Lunberry and his attorney, the state's attorney, and the state circuit court judge.   A transcript from that hearing reveals the following.

Officer Dadrea Rabeler was called as the first witness.  See State Court Transcript ("SCT") at page 4 (Attached as Exhibit 6 to the Affidavit of Michaele Sanders Hofmann [Docket No. 42] in support of Ryan Lunberry's Motion to Suppress).

Officer Rabeler testified that she was an officer with Oglala Sioux Tribal Safety on December 19, 2005, and that she was on patrol.  See SCT at 4.  At approximately 11 p.m., Officer Rabeler and her fellow patrol officer received a report from dispatch of a suspicious white

Dodge pickup truck with Nebraska license plates that was driving back and forth around the Makayla Winters residence.  Id.  Officer Rabeler recognized the Winters residence as being one known to law enforcement to be a site where illegal drugs were used and sold.  Id.  at 4-5, 20-21. The report indicated that there were three individuals in the vehicle.  Id. at 5.  Officer Rabeler and her partner responded to the location described by dispatch.  Id. at 5-6.

As Officer Rabeler approached, she saw two vehicles either parked or moving extremely slowly next to each other in the middle of the highway, facing opposite directions.  Id. at 6, 24, 32.  Officer Rabeler believed this to be suspicious behavior because the speed limit where the vehicles were stopped was 55 miles per hour and the vehicles were just sitting in the middle of the highway.  Id. at 6, 32.[3]  The vehicles were not immediately identifiable to Officer Rabeler as all she could see were the headlights of one and the taillights of the other.  Id. at 6, 24.

Upon the arrival of Officer Rabeler's patrol vehicle, one of the vehicles began driving west toward the Mormon church and then made a right-hand turn.  Id. at 7.  Officer Rabeler and her partner were following the vehicle and were able to identify it as a white Dodge pickup when it made the turn.  Id. at 7-8.  Officer Rabeler then ran a check on the license plates and confirmed that this was the same vehicle that dispatch had earlier described.  Id.  at 8.  Officer Rabeler and her partner then initiated a stop of the vehicle.  Id. at 8-9.

Defendant Michael Waldron was driving, defendant Ryan Lunberry was in the front passenger's seat, and defendant Richard Fisher was in the rear seat.  Id. at 11-12.  Upon

---

[3]  There is some suggestion from cross-examination that the speed limit in the area where the vehicle was located was 35 miles per hour, not 55.  However, whichever the speed limit, Officer Rabeler stuck to her testimony that it was suspicious for a vehicle to be stopped in the middle of the highway.

approaching the vehicle, Officer Rabeler noticed an open 12-pack of beer in the front seat between Waldron and Lunberry.  Id. at 10.  It is illegal to possess or consume any alcoholic beverage on the Pine Ridge Indian Reservation.  Id.  The driver, Mr. Waldron, appeared very nervous to Officer Rabeler.  Id. at 11.  Officer Rabeler noticed that the back seat passenger, Fisher, had a blanket or a jacket over his lap.  Id. at 12.  This gave Officer Rabeler concerns for her safety and she asked the passenger to remove the covering.  Id.  When he did so, Officer Rabeler discovered a large gun case with a gun in it.  Id.  Officer Rabeler then asked all three occupants of the vehicle to raise their hands and she asked them if there were any other weapons in the vehicle.  Id.  Fisher told Officer Rabeler that there was another weapon to his left and Mr. Lunberry indicated that there was another weapon to his left.  Id.  Officer Rabeler retrieved both weapons.  Id.

At this point, Mr. Waldron was arrested and a search of the vehicle was conducted for safety purposes so that law enforcement could drive the vehicle to an impound lot.  Id. at 13.  The vehicle was impounded because of the presence of the weapons with no proof of ownership for the weapons.  Id.  Mr. Lunberry and Mr. Fisher were detained for security purposes until the vehicle could be cleared.  Id.  The search of the vehicle turned up cocaine in a baggie, methamphetamine in a small round can, and a marijuana pipe.  Id. at 13-16.  State court drug charges followed, as did these federal weapons charges.

Officer Loud Hawk also testified at the state court hearing.  See Exhibit 2 to Affidavit of Michaele Sanders Hofmann [Docket No. 42] filed in support of Ryan Lunberry's Motion to Suppress.  Much of what Officer Loud Hawk testified to was the same as Officer Rabeler's

testimony, but Officer Loud Hawk gave the following additional or different information.
Officer Loud Hawk, a patrol officer for the Oglala Sioux Tribe, testified to being on patrol with
Officer Rabeler on December 19, 2005, when dispatch reported the suspicious vehicle call.  See
SCT at 90.  Officer Loud Hawk added the detail that dispatch had indicated the three occupants
of the suspicious vehicle were white males and that the caller who had reported the suspicious
vehicle was Kelsey Janis, who was not known to Officer Loud Hawk.  Id. at 92.  The suspicious
behavior was that the vehicle was driving back and forth in front of a house several times.  Id. at
96.

Officer Loud Hawk described the reason for the vehicle stop as the "fact that they were
coming to a stop in the middle of the road, from what I could tell, that was suspicious, . . ."  Id. at
104.  Officer Loud Hawk expanded on Officer Rabeler's description of Waldron's nervousness
by saying that Waldron was nervous, sweating, and "his eyeballs were bouncing back and forth,
just like a nervous person talking."  Id. at 106.  Officer Loud Hawk also clarified that, when
he placed Michael Waldron under arrest after the traffic stop and the discovery of the beer, that
the charge was a tribal charge of public intoxication.  Id. at 99.  Officer Loud Hawk indicated that
he had no contact with Shannon County Sheriff Jim Daggett until after the arrest and seizure of
Waldron and his vehicle.  Id. at 101-102.  Sheriff Daggett had not provided any of the authority
for the traffic stop that Officer Loud Hawk or Officer Rabeler relied upon because such authority
was never communicated to them.  Id. at 102, 108.

Sheriff Jim Daggett also testified at the state court hearing.  See Exhibit 1, State Court
Transcript ("SCT"), attached to Affidavit of Michaele Sanders Hofmann [Docket No. 42], filed
in support of Ryan Lunberry's Motion to Suppress.  Sheriff Daggett testified that he received a

call on December 19, 2005, from the Pine Ridge dispatch reporting a white pickup with Nebraska license plates that was driving in a suspicious manner.  <u>See</u> SCT at 71-72.  Dispatch was contacting Sheriff Daggett because it was believed that the occupants of the vehicle might not be tribal members.  <u>Id.</u> at 72.  Indian tribes cannot assert criminal charges over individuals who are not members of the tribe.  <u>See</u> <u>Oliphant v. Suquamish Indian Tribe</u>, 435 U.S. 191, 195-196 (1978).  Because Sheriff Dagget  was two hours away from the location of the pickup, he directed dispatch to have tribal law enforcement officials make the stop and confirm whether there was a problem.  <u>Id.</u> at 72.  Although dispatch conveyed to Officers Rabeler and Loud Hawk the substance of the citizen report, it apparently did not convey Sheriff Daggett's directive to conduct a vehicle stop.  <u>Id.</u> at 101-102, 108 (Officer Loud Hawk's testimony).  Sheriff Daggett had nothing further to do with Mr. Waldron or Mr. Lunberry until he transported them from the Pine Ridge jail a day or two after the tribal officers had arrested them.  <u>Id.</u> at 73-75.

Mr. Lunberry and Mr. Waldron object to the court's consideration of the transcripts of the witnesses' sworn state court testimony in this proceeding.  Further, Mr. Lunberry and Mr. Waldron argue that transcripts reveal that Officers Loud Hawk and Rabeler lacked reasonable suspicion to stop their vehicle and, thus, that the stop violated their rights under the Fourth Amendment to the United States Constitution.

## DISCUSSION

**A.    Whether Transcripts May be Considered in Lieu of Live Testimony**

**1.    The Rules of Evidence Do Not Prohibit Introduction of Transcripts**

In the determination of preliminary questions of whether to admit evidence at trial, the court is not bound by the rules of evidence except as to the Rules governing privileges.  Federal Rule of Evidence § 104(a) states in part:

> Rule 104. Preliminary Questions
> (a) Questions of Admissibility Generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court . . .  In making its determination it is not bound by the rules of evidence except those with respect to privileges.

See Fed. R. Evid. 104(a).

In United States v. Matlock, 415 U.S. 164, 169 (1974), the Supreme Court resolved the issue of whether hearsay from the defendant's wife should have been admitted at the suppression hearing in the case.  The Court, relying on Rule 104, held that the district court had erred by not admitting the hearsay.  Matlock, 415 U.S. at 169.  In so concluding, the Court held that the rules of evidence are not applicable at suppression hearings and that otherwise inadmissible evidence can still be considered by the trial court in determining admissibility issues so long as the evidence contains some indicia of reliability.  Id. at 172-177.  Rule 104, and the Court's ruling in Matlock, are *discretionary* in nature.  They grant the court the discretion to dispense with the rules of evidence (except as to privileges) when the Court considers *preliminary* questions concerning the admissibility of evidence.  See Matlock, 415 U.S. at 172-177; Fed. R. Evid. 104(a).

7

Similarly, in United States v. Raddatz, 447 U.S. 667, 679 (1980), the Court rejected the defendant's argument that the district court, upon entertaining an appeal of a magistrate judge's report and recommendation on a suppression hearing, was constitutionally required by the *de novo* standard of such an appeal to rehear live testimony.   Raddatz, 447 U.S. at 680-681.  In so deciding, the Court stated that "This Court on other occasions has noted that the interests at stake in a suppression hearing are of a lesser magnitude than those in the criminal trial itself.  At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial."  Raddatz, 447 U.S. at 679 (citing United States v. Matlock, 415 U.S. 164, 172-174 (1974); Brinegar v. United States, 338 U.S. 160, 172-174 (1949); Fed. R. Evid. 104(a), 1101(d)(1)).  "Furthermore, although the Due Process Clause has been held to require the Government to disclose the identity of an informant at trial, provided the identity is shown to be relevant and helpful to the defense, . . . , it has never been held to require the disclosure of an informant's identity at a suppression hearing."  Raddatz, 447 U.S. at 679 (citing McCray v. Illinois, 386 U.S. 300 (1967); Roviaro v. United States, 353 U.S. 53, 60-61 (1957)).  "We conclude that the process due at a suppression hearing may be less demanding and elaborate than the protections accorded the defendant at the trial itself."   See also United States v. Maza, 93 F.3d 1390, 1396 (8th Cir. 1996) (holding that it was permissible for the district court to accept hearsay evidence at a suppression hearing "if the court is satisfied that the statements were made and that there is nothing to raise a serious doubt about their truthfulness.").

Here, although discretionary, the court finds that transcripts offered contain sufficient indicia of reliability to warrant their consideration, and the court will accept them into evidence in ruling on this preliminary question of admissibility.  The indicia of reliability include the

following: defendants were present and represented by counsel at the prior hearing where the testimony was given, the defendants had a similar motivation for cross-examining the witnesses (i.e. the suppression of evidence at a criminal trial), and the witnesses who testified did so under oath, and thus, it would have been against their penal interest to have testified falsely.

The government argues that, in addition to Raddatz, the court can accept the transcripts as substantive evidence because Mr. Lunberry introduced the transcripts into this record by attaching the transcripts and incorporating them by reference into Lunberry's motion to suppress. Because the court has already determined that the transcripts can be admitted under Fed. R. Evid. 104(a), the court need not rule on this alternative argument.

### 2.      The Sixth Amendment Does Not Prohibit Introduction of Transcripts

The Sixth Amendment states that in all "criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  See U.S. Const. amend. VI.  In Crawford v. Washington, the Supreme Court held that the confrontation clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S. 36, 53-54 (2004).  The Crawford decision does not contain a comprehensive definition of "testimonial," the Court having stated that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."  Id. at 68.

Mr. Waldron argues that because the Crawford Court listed testimony at a preliminary hearing as a type of testimonial evidence that would *not* be admitted at trial, the prior testimony of the witnesses in this case in the state court suppression hearing should also not be admitted.

9

Because preliminary hearing testimony is not admissible at trial under Crawford, neither should testimony from the state court hearing in this case as both were instances of prior sworn testimony at which the defendant was present and had the opportunity for cross-examination.  If one is inadmissible, so is the other, Mr. Waldron argues.

However, the question of admissibility before this court is not whether the transcripts should be admitted at *trial,* but whether they should be admitted at a suppression hearing. Several courts have specifically held that the confrontation right emanating from the Sixth Amendment described in Crawford applies only to trial and *not* to a pretrial suppression hearing.  See Francischelli v. Potter, 2007 WL 776760 *10 (E.D.N.Y. 2007) (citing Washburn v. United States, No. 3:05-cv-774, 2006 WL 3715393 *4 (N.D. Ind. Dec. 14, 2006) ("[C]ases decided after Crawford v. Washington reaffirm the admissibility of hearsay statements at suppression hearings.").  The Washburn court noted that the Supreme Court has previously determined that hearsay evidence is admissible at pretrial suppression hearings (citing Raddatz) and that the Sixth Amendment right to confrontation is a right inuring at trial, not at a pretrial hearing. Pennsylvania v. Ritchie, 480 U.S. 39, 52 (1987).

_____

In ruling on the admissibility of the transcripts in this case, the court recognizes that live testimony is vastly preferable than accepting the transcripts offered in this case.  However, both the government and the defendants have attempted to subpoena the same three witnesses and both have been unsuccessful.  Given the choice of rejecting the transcripts and granting the motions on a default basis or accepting the transcripts and ruling on the merits of the motions, the court prefers the latter, particularly where there is nothing to suggest that the testimony contained

10

in the transcript is unreliable.  The Supreme Court in <u>Raddatz</u> specifically noted that "Nothing in

the Magistrates Act or other statute precludes renewal at trial of a motion to suppress evidence

even though such motion was denied before trial.  A district court's authority to consider anew a

suppression motion previously denied is within its sound judicial discretion." <u>Raddatz</u>, 447 U.S.

at 678 n.6 (citing <u>Gouled v. United States</u>, 255 U.S. 298, 312 (1921); <u>Rouse v. United States</u>, 359

F.2d 1014 (1966)).  Thus, if the government or the defendants locate these witnesses before trial,

the district court has the discretion to entertain defendants' suppression motions anew and to

conduct a hearing with live testimony.  If the government fails to locate these witnesses before

trial, it would appear that no trial would take place at any rate.

**B.**     **Whether the Officers Were Justified in Stopping Defendants' Vehicle**

When a law enforcement officer stops a motor vehicle and questions its occupants, the stop

constitutes a search and seizure under the Fourth Amendment, "even though the purpose of the

stop is limited and the resulting detention quite brief." <u>Brendlin v. California</u>, 551 U.S. ___, 127

S. Ct. 2400, 2406 (2007);  <u>Delaware v. Prouse</u>, 440 U.S. 648, 653 (1979); <u>United States v.

Wheat</u>, 278 F.3d 722, 726 (8th Cir. 2001).  A stop of the driver of a vehicle results in a seizure

under the Fourth Amendment of all occupants of the vehicle. <u>Brendlin</u>, 551 U.S. ___, 127 S. Ct.

at 2406-2408.  The "<u>Terry</u> stop" is a variety of traffic stop that, although it is a seizure, is

permissible under the Fourth Amendment if it is supported by "reasonable suspicion."

In <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), the Supreme Court stated the basis of what was to

become known as a "<u>Terry</u> stop":

> [W]here a police officer observes unusual conduct which leads him reasonably to
> conclude in light of his experience that criminal activity may be afoot and that the
> persons with whom he is dealing may be armed and presently dangerous, where in

the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him."

Terry, 392 U.S. at 30.  The original "Terry stop" applied to a pedestrian, but courts have expanded the analysis in Terry to apply to vehicle stops.  See Ornelas v. United States, 517 U.S. 690, 693 (1996); United States v. Spotts, 275 F.3d 714, 718 (8th Cir. 2002); United States v. Bell, 183 F.3d 746, 749 (8th Cir. 1999).  This body of law has also expanded to include stops based not on the officer's own personal observation, but on information given to the officer by an informer, either known or anonymous.  See Alabama v. White, 496 U.S. 325 (1990); Adams v. Williams, 407 U.S. 143 (1972).

An officer making a Terry stop "must be able to articulate something more than an 'incohate and unparticularized suspicion or "hunch." ' " United States v. Sokolow, 490 U.S. 1, 7 (1989).  The Fourth Amendment requires "some minimal level of objective justification" for making the stop.  INS v. Delgado, 466 U.S. 210, 217 (1984).  The Court has held that probable cause means " 'a fair probability that contraband or evidence of a crime will be found,' and the level of suspicion required for a Terry stop is obviously less demanding than for probable cause." Sokolow, 490 U.S. at 7 (citing Illinois v. Gates, 462 U.S. 213, 238 (1983)).  "Police must have a 'particularized and objective basis' for suspecting criminal activity at the time the stop is made." Spotts, 275 F.3d at 718.

"Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or

12

content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." Alabama v. White, 496 U.S. 325, 330 (1990). "Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors–quantity and quality–are considered in the 'totality of the circumstances–the whole picture,' that must be taken into account when evaluating whether there is reasonable suspicion." Id. at 330 (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)).

If the investigatory stop is not supported by reasonable suspicion or if the officers exceed the proper scope of the stop, then any evidence derived from the stop must be excluded from trial. Wong Sun v. United States, 371 U.S. 471, 484 (1963); United States v. Wheat, 278 F.3d 722, 726 (8th Cir. 2001).

The Supreme Court first analyzed a Terry stop based on a tip from an informer in Adams v. Williams, 407 U.S. 143 (1972). The facts of Adams were as follows. At approximately 2 a.m. in a high-crime area, Police Sergeant John Connolly was patrolling in his police cruiser when he was approached by a person known to Connolly. Adams, 407 U.S. at 144. This person told Connolly that an individual seated in a nearby vehicle was carrying narcotics and had a gun tucked into his waistband. Id. at 144-145. Acting to investigate this information, Connolly then approached the vehicle, tapped on the car window, and asked the occupant to open the car door. Id. at 145. The occupant of the vehicle, Robert Williams, instead rolled down his car window. Id. Connolly then reached into the car and removed a fully loaded revolver from the waistband of Williams' trousers. Id. The gun had not been visible to Connolly from outside the vehicle, but was in the exact location previously indicated by the informant. Id. at 145. Williams was

then arrested for unlawful possession of a firearm.  Id.  A search incident to Williams' arrest uncovered a quantity of heroin, the illegal possession of which Williams was also eventually charged.  Id.  Williams had been convicted and the Second Circuit subsequently granted relief pursuant to a petition for habeas corpus, concluding that Connolly's actions violated Williams' rights under the Fourth Amendment to be free from unreasonable searches and seizures.  Id. at 144.

The United States Supreme Court reversed.  Id. at 144.  The Court concluded that Connolly's actions had been in conformity with the standards established in Terry v. Ohio, 392 U.S. 1 (1968).  Id.  Specifically, as to the propriety of Officer Connolly relying on the informant, the Court noted that Connolly knew the informant personally, that the informant had provided information to Connolly in the past, the informant came forward personally to the officer, the information provided by the informant was immediately verifiable at the scene, and, under Connecticut law, the informant would have been subject to arrest for making a false report if the information he provided to Connolly was incorrect.  Id. at 146-147.  Under these facts, the Court concluded that the information carried enough indicia of reliability to justify Officer Connolly's stop of Williams.  Id. at 147.

In reaching its conclusion, the Court specifically rejected the notion that a law enforcement officer's reasonable cause to conduct a Terry stop must be based solely on the officer's personal observations.  Id. at 147.  The Court also noted that the quality of an informant's tips may vary greatly in their value and reliability, with some warranting a Terry stop and others requiring no action or additional verification and investigation on the part of the police.  Id.  Once Officer

14

Connolly found the gun exactly where the informant said it would be, probable cause existed for Williams' arrest.  Id. at 148.

The Supreme Court next addressed a Terry stop based on an anonymous tip in Alabama v. White, 496 U.S. 325 (1990).  In that case, law enforcement received an anonymous telephone tip stating that Vanessa White would be leaving 235-C Lynwood Terrace Apartments at a particular time in a brown Plymouth station wagon with the right taillight lens broken, that she would travel to Dobey's Motel, and that she would have approximately one ounce of cocaine in her possession in a brown attaché case.  Id. at 327.   Law enforcement then traveled to 235-C Lynwood Terrace Apartments and located a brown Plymouth station wagon with a broken right taillight in the parking lot.  Id.  The officers then observed White exit the apartment building carrying nothing and drive away in the station wagon.  Id.  The officers followed White and observed that she was driving on the most direct route to Dobey's Motel.  Id.  On the highway on which the motel was located, White's vehicle was stopped.  Id.  The officers told her she was stopped on suspicion of possession of cocaine and asked for permission to search her vehicle, which White gave.  Id. Marijuana was found in a brown attaché case and three milligrams of cocaine were found in White's purse.  Id.

The Supreme Court granted certiorari specifically to answer the question whether an anonymous tip could furnish reasonable suspicion for a Terry stop.  Id. at 328.  The Court stated that the test for determining whether an anonymous tip establishes *probable cause* is the totality of circumstances, with special emphasis on the informant's veracity, reliability, and basis of knowledge.  Id. at 328-329.  However, the Court also said that where, as here, the standard is not probable cause but rather *reasonable suspicion*, "allowance must be made in applying [these

15

factors] for the lesser showing required to meet that [reasonable suspicion] standard." Id. at 328-329.

The Court observed that "if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." Id. at 330.  In this case, the Court concluded that the anonymous tip had been sufficiently corroborated to furnish reasonable suspicion for White's stop.  Id. at 331.  This was so even though the officers did not corroborate the driver's name before stopping her nor did they see the apartment number from which she exited.  Id.  The Court cited the Gates opinion for the proposition that once an informant is shown to be right about some things, it is probable that he is right about other facts alleged as well.  Id.  Here, the Court concluded that "the independent corroboration by the police of significant aspects of the informer's predictions imparted some degree of reliability to the other allegations made by the caller."  In so concluding, the Court said it was important to its analysis that "the anonymous tip contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted."  Id. at 332 (quoting Illinois v. Gates, 462 U.S. 213, 245 (1983)).

In this case the Court noted that it would have been easy for virtually anyone to predict the existence of the described car in the parking lot because it was a condition that existed at the time of the call.  Id. at 332.  Far more probative of the informant's reliability was his ability to predict that White would leave, when White would leave, and where she would travel to when she left, all of  which showed an intimate  knowledge of White's itinerary.  Id.

16

More recently, the Supreme Court addressed another <u>Terry</u> stop based on a legally insufficient anonymous tip in <u>Florida v. J.L.</u>, 529 U.S. 266 (2000).  In the <u>Florida v. J.L.</u> case, the issue decided by the Court was: "whether an anonymous tip that a person is carrying a gun is, without more, sufficient to justify a police officer's stop and frisk of that person."  <u>J.L.</u>, 529 U.S. at 268.  The Court held that the tip in this case was not sufficient to provide the officer with reasonable suspicion.  <u>Id.</u>

The facts were that an anonymous telephone call was received by the police indicating that a particular black man, located at a particular bus stop and wearing a plaid shirt, was carrying a gun.  <u>Id.</u>  Police went to the bus stop about six minutes later and saw three black men, only one of which was wearing a plaid shirt.  <u>Id.</u>  There was no other fact or circumstances to indicate to the officers that illegal activity was afoot.  <u>Id.</u>  One of the officers approached J.L., frisked him, and seized a gun from J.L.'s pocket.  <u>Id.</u>

Key to the Court's holding was that the identity and location of the informer in this case was not known to the police, thus making it difficult for the officers to assess the informer's basis of knowledge or veracity.  <u>Id.</u> at 270.  Furthermore, unlike the tip given in <u>White</u>, the tip in this case did not predict future movement of the suspect, so there was no inference that could be drawn that the informer had inside knowledge about the suspect and therefore was a credible source of information.  <u>Id.</u> at 270-271.  The fact that the informer in <u>J.L.</u> turned out to be correct about the presence of a gun did nothing to support the reasonableness of the officers' suspicion *before* the frisk, the time frame under <u>Terry</u> for assessing the officer's basis for acting.  <u>Id.</u>  The Court stated that the fact that an informer has correctly identified the person accused is insufficient to give the police reasonable suspicion; instead, the tip must "show that the tipster

has [credible] knowledge of *concealed criminal activity*." Florida, 529 U.S. at 272 (emphasis supplied).

The Court was careful to state that the "requirement that an anonymous tip bear standard indicia of reliability in order to justify a stop in no way diminishes a police officer's prerogative, in accord with Terry, to conduct a protective search of a person *who has already been legitimately stopped.*" Id. at 274.  Thus, if the officer has a reasonable suspicion to stop the person, quite apart from information contained in a tip, the unreliability of the tip does not affect the propriety of the officer's decision to stop the suspect.

There are two recent Eighth Circuit cases applying the law from White, Williams, and J.L. In United States v. Spotts, 275 F.3d 714 (8th Cir. 2002), law enforcement became suspicious that methamphetamine was being manufactured in a garage of the Hughes residence on First Street in North Platte, Nebraska, after the next door neighbor, a state trooper, reported smelling ether coming from the garage.  Id. at 716-717.  Law enforcement then began surveillance on the Hughes residence.  Id.  During this surveillance of the Hughes house, Spotts' vehicle had been observed stopped in the alley behind the garage of the Hughes house.  Id.  Spotts exited his vehicle and looked under his truck with a flashlight, then got back in and drove away, having been there only a few minutes.  Id.  Spotts neither entered the Hughes residence or garage nor did he speak to anyone from the house or garage.  Id.  Prior to Spotts' arrival at the Hughes house, law enforcement had received several "intelligence reports" that Spotts was distributing methamphetamine in the North Platte area and that he carried a 9mm handgun.  Id.

Law enforcement obtained a search warrant for the Hughes residence.  Id.  While Drug Enforcement Agents were searching the Hughes house pursuant to the warrant, Spotts drove by

18

in the same truck that had been observed previously.  Id.  Nebraska police stopped Spotts'

vehicle and observed a bag of methamphetamine and a pistol in plain sight inside the stopped

truck and arrested Spotts.  Id.

      The Eighth Circuit held that the anonymous tips about Spotts in this case, together with the

facts known about the Hughes house and the fact that Spotts stopped at the Hughes house and

then came back again the next day, all combined together to provide the officers with the

necessary reasonable suspicion to support their stop of Spotts' truck.  Id. at 721-722.

      In United States v. Wheat, 278 F.3d 722 (8th Cir. 2001), an anonymous motorist placed a 9-

1-1 call on his cell phone to report that a tan-and-cream-colored Nissan Stanza "or something

like that," the license plates of which began with the letters "W-O-C" was driving erratically in

the northbound lane of Highway 169 eight miles south of Fort Dodge, Iowa.  Id. at 724.  The

caller reported that the Nissan was passing on the wrong side of the road, cutting off other cars,

and being driven by "a complete maniac."  Id.

      Shortly thereafter, a law enforcement officer say a tan Nissan Maxima with a license plate

beginning with "W-O-C" stopped in the northbound lane of Highway 169 at the intersection of

Highway 20.  Id.  The Nissan made a right turn and the officer stopped it immediately without

having seen any erratic or illegal driving.  Id. at 724-725.  Wheat was the only occupant of the

vehicle.  Id.  While the first officer was running a license and records check on Wheat, a second

officer arrived.  Id. at 725.  The records check on Wheat indicated that his driver's license had

been suspended, but that the suspension had already been served.  Id.  The first officer noticed

that Wheat's hands were fidgeting, and he asked the second officer if he had had any previous

experience with Wheat.  Id.  The second officer replied that Wheat had a history of drug

problems and that he had fled from police on several occasions.  Id.  Upon receiving this information, the first officer asked Wheat for permission to search the vehicle, which Wheat gave.  Id.  Crack cocaine and marijuana were found.  Id.

In rejecting Wheat's Fourth Amendment challenge to the vehicle stop, the Eighth Circuit defined the analysis applicable to the determination of whether an anonymous tip of erratic driving provides reasonable suspicion for an investigatory stop.  Id. at 731-738.  The court held that the tip must provide sufficient quantity of information, such as the make and model of the vehicle, its license plate numbers, its location and bearing, and similar innocent details so that the officer can ascertain that the vehicle stopped is the same one referenced in the tip.  Id. at 731. The court also noted that the shorter the lapse in time between the receipt of the tip and the officer's stop of the vehicle, the more reliable the information in the tip.  Id. at 732.  The court also required that the tip contain a sufficient quantity of information to support an inference that the tipster has witnessed an actual traffic violation that compels an immediate stop.  Id.  The Eighth Circuit noted that the Supreme Court's decision in White did not *require* that the tip predict future action, and the Eighth Circuit refused to require that the tip predict future activity either in the case of erratic driving.  Id. at 732-734.  Under the facts of this case, the court held that the officer's stop of the Wheat vehicle based on the anonymous tip was supported by reasonable suspicion.  Id. at 737.

Applying the above law to the facts in this case, it is clear that Officers Rabeler and Loud Hawk had reasonable suspicion to stop Mr. Waldron's pickup.  First, the fact that Mr. Waldron's vehicle was stopped in the middle of a highway was suspicious enough to justify the stop.  The court notes that Mr. Waldron was not pulled over to the shoulder of the road, as a motorist would

who was experiencing difficulty, needed a rest, or was consulting a map.  Rather, his vehicle was stopped in the middle of the highway along side another vehicle.  Furthermore, the tip provided by dispatch reinforced the officers' reasonable suspicion.  Mr. Waldron's vehicle was driving back and forth repeatedly in front of a home known for its association with illegal drugs.  The tipster, while not known to the officers, did identify herself by name, thus subjecting herself to prosecution for making a false report.  The tip contained the color, make and license number of Mr. Waldron's pickup, all of which matched the vehicle that the officers actually stopped.  Also, the tip stated that three white males were in the pickup, which was also accurately described the occupants of Mr. Waldron's vehicle.

Mr. Waldron concedes that reasonable suspicion can exist even where the observed behavior is entirely legal, but argues that the tip should not constitute reasonable suspicion in this case because it revealed no illegal activity.  In United States v. Perkins, 363 F.3d 317, 326-327 (4th Cir. 2004), there was an informer's tip as to open gun possession, an activity that was *legal* in West Virginia.  The defendant argued that his Fourth Amendment rights were violated because the tip did not report illegal activity, only legal activity.  The court rejected this argument.  The court drew a distinction between the reasonable suspicion standard required in Terry and the probable cause standard applicable in other contexts.  Under the probable cause standard, the question is whether the officer had a reasonable basis for believing that a suspect "had committted or was committing an offense."  In other words, criminal activity must have already occurred or be occurring.  The reasonable suspicion standard asks whether the officer reasonably believes that "criminal activity may be afoot."  The difference, the court explained, was between

past or present illegalities (probable cause) and an officer's ability to prevent future wrongdoing (reasonable suspicion), which is at the heart of Terry.

The Perkins court noted that in Terry itself, the actions of the defendants which the officers observed was itself legal–they were pacing back and forth and talking to each other outside of a store. Perkins, 363 F.2d at 327 (citing Terry, 392 U.S. at 22-23). In Perkins the tip from the known informer was that two men were pointing rifles in various directions in the front yard of a duplex well known for drug activity in a high crime and drug trafficking area. Perkins, 363 F.3d at 327. It is not illegal to openly carry a firearm under West Virginia law, and sportsmen routinely display hunting and sporting rifles. Id. However, the context of the tip was important: here, the activity was taking place outside of a known drug house in the middle of a residential, high-crime, drug-ridden neighborhood. Id. This type of activity in this setting, "would give any officer a commonsensical reason to be suspicious." Id. The court concluded that reasonable suspicion existed because the reported behavior, while legal, rightfully aroused the officer's suspicion warranting an investigatory stop.

Although the Perkins decision is not controlling authority in this jurisdiction, it is in accord with Supreme Court precedent, which is controlling. See Illinois v. Wardlow, 528 U.S. 119 (2000). In Wardlow, police officers were patrolling an area where heavy drug trafficking occurred. Wardlow, 528 U.S. at 121. Upon seeing the officers, Wardlow fled. Id. The officers caught up with him, stopped him, and patted him down, discovering a .38-caliber handgun. Id. The Court held that the search of Wardlow under these circumstances did not violate the Fourth Amendment. Id.

22

The Court stated that a person's presence in "an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that a person is committing a crime." Id. at 124 (citing Brown v. Texas, 443 U.S. 47 (1979)).  But the fact that the stop occurred in a high crime area is relevant to the reasonable suspicion inquiry. Id.  Here, the officers' suspicion was also supported by Waldron's unprovoked flight. Id. at 124-125.  The Wardlow decision did not involve a tip, as Perkins did, but the activity of Waldron in that case, like the activity of Perkins and Terry, was legal activity.  Given the context, however, each court found the legal activity of each defendant to nonetheless give rise to reasonable suspicion supporting the officers' stops. See also 4 Wayne R. LaFave, Search & Seizure § 9.5(h), 571 (2004) (stating that the central issue of cases involving tips in the context of Terry stops "is whether the informant's information is so reliable and complete that it makes past, present *or pending* criminal conduct sufficiently likely to justify a stopping of the designated person for investigation.") (emphasis supplied).  This court concludes, also, that given the entire context of all the facts known to Officers Loud Hawk and Rabeler, they had reasonable suspicion to stop Mr. Waldron's vehicle.

## CONCLUSION

Based on the evidence adduced at the hearing, the above findings of fact, and the law, the court recommends that defendant Michael Waldron and defendant Ryan Lunberry's motions to suppress [Docket Nos. 40 and 45] be denied.

## NOTICE TO PARTIES

The parties have ten (10) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause

is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Objections must be timely and specific in order to require *de novo* review by the district court.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

Dated July 17, 2007.

BY THE COURT:

/s/ *Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE